IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARCUS J. JOHNSON, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 20-1732-RGA |
| C/O TIMOTHY BRADY, et al., | : |
| Defendants. | : |

Marcus J. Johnson, Wilmington, Delaware. Pro Se Plaintiff.

Andrew Robert Fletcher, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

## MEMORANDUM OPINION

September 12, 2023
Wilmington, Delaware


ANDREWS, U.S. District Judge:

In November 2020, Plaintiff Marcus J. Johnson, then an inmate at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware, filed this action pursuant to 42 U.S.C. § 1983 in the Superior Court of the State of Delaware in and for New Castle County.[1] (D.I. 1-1 at 4-12). He appears *pro se* and was granted leave to proceed *in forma pauperis* by the Superior Court. (D.I. 1-2 at 5). On December 21, 2020, Defendants Timothy Brady, Cpl. McCormick, and Warden Robert May filed a notice of removal of *Johnson v. Brady*, Delaware Superior Court Case No. N20C-11-146 AML (Del. Super.). (D.I. 1). Plaintiff filed an Amended Complaint on January 11, 2021. (D.I. 10). Before the Court is Defendants' motion for summary judgment. (D.I. 54). Briefing is complete.

I.  **BACKGROUND**

Plaintiff claims that he was unreasonably strip searched in violation of the Fourth Amendment to the United States Constitution.[2] Plaintiff testified to following during his deposition. (D.I. 55-1). On June 19, 2020, he was told by a non-defendant JTVCC employee that he was being transferred to isolation for "promoting prison contraband," and he would be given around ten minutes to return to his cell and pack his belongings. (*Id.* at 13). Defendant C/O Brady came to Plaintiff's cell and told him it was time to go. They disagreed about how much time Plaintiff had left. Plaintiff ultimately ignored C/O

---

[1] When bringing a §1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

[2] Plaintiff's Amended Complaint contained additional claims, but they have been dismissed. (D.I. 18, 19).

Brady and continued collecting his things. Brady said, "Oh, you're going to be an asshole. Come on, let's go. I have shit to do." (*Id.* at 15).[3] Plaintiff again told Brady he was given ten minutes and it had not been ten minutes. Brady replied "Oh, you want to be a smart ass. I have something for people like you." (*Id.* at 16).

Brady handcuffed Plaintiff and escorted Plaintiff to the infirmary, where he was briefly questioned by medical personnel to make sure he was okay. Brady then escorted Plaintiff to the receiving room, which is where prisoners are processed when moving between different security levels; in Plaintiff's case, to a higher level of security. In the receiving room, Brady strip searched Plaintiff. According to Plaintiff, there was nothing unusual about the strip search, and, to Plaintiff's knowledge, strip searches were performed in the receiving room per policy, or at least per practice.

Plaintiff was given a SHU (*i.e.*, Security Housing Unit) uniform, handcuffed, and escorted by Brady and a K-9 officer to isolation in the SHU in Building #18. The walk took about five minutes and the group did not interact with anyone else on the way, besides being buzzed into building #18 by main control and handing over paperwork for Plaintiff, and walking with Defendant Corporal McCormick and another correctional officer to Plaintiff's isolation cell.

Upon arrival at the cell, Defendant McCormick asked Defendant Brady whether Plaintiff had been strip searched. Brady responded, "Yeah, I strip searched him in receiving, but we can get him again." (*Id.* at 36). McCormick responded, "Okay, let's do it." (*Id.*). Defendant McCormick gave the instructions during the strip search, and both

---

[3] Citations to the deposition at D.I. 55-1 refer to the pagination in the header.

Brady and the other correctional officer were present. After the strip search, Brady said, "I told you that I have something for you smart ass." (*Id.* at 41). Plaintiff was stripped search a third and final time that day between 4:00 and 5:00 p.m. For the remainder of his stay in isolation, from June 20, 2020, through July 2, 2020, he was strip searched once every day, during the approximate time frame of 4:00 p.m. to 6:00 p.m. Plaintiff does not know the identities of the various correctional officers that strip searched him daily during this period of time. Plaintiff alleged in his Amended Complaint that, as an inmate in isolation, he did not have unsupervised contact with anyone, including DOC staff. (D.I. 10 at 5-6).

Plaintiff wrote a staff complaint to Defendant Randall Dotson and complained about the strip searches. On July 12, 2020, Plaintiff wrote a staff complaint/appeal to Defendant Warden May regarding the strip searches. The Warden's office responded that "no policy was violated." (D.I. 55-1 at 53). Defendant May sent non-defendant Lt. Spencer to meet with Plaintiff, accompanied by two other correctional officers. During the meeting, one of the officers interjected to say that strip searches formerly took place during each shift, but the policy was changed upon orders from Dotson, May, and the security superintendent to one strip search of inmates housed in isolation once a day.

Plaintiff's live claims are a Fourth Amendment claim against Defendants Brady and McCormick based on the second strip search,[4] and a Fourth Amendment claim against Defendants Dotson and May based on the policy of strip searching inmates in

---

[4] Plaintiff concedes that the first strip search, conducted by Brady in the receiving room, was reasonable. (D.I. 57 at 2) ("Plaintiff never claimed that the first strip search[] conducted by c/o Brady was unconstitutional.").

isolation once a day. Defendants have moved for summary judgment, and each invokes the doctrine of qualified immunity. Plaintiff has filed a response in opposition.

## II.   LEGAL STANDARDS.

Rule 56(c) requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

As a general rule, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." The mere existence of some alleged factual dispute between the parties will

4

> not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up).

## III.   DISCUSSION

All four named Defendants invoke qualified immunity, and all four are entitled to the same.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)) (per curiam). The qualified immunity assessment involves two factors: (1) whether the plaintiff sufficiently alleged a right was violated, and (2) whether that right was clearly established when it was violated to the extent "that it would have been clear to a reasonable person that his conduct was unlawful." *Williams v. Sec'y Pennsylvania Dep't of Corrs.*, 848 F.3d 549, 557 (3d Cir. 2017). The Third Circuit has emphasized the importance of "defin[ing] the right at the appropriate level of specificity," "because only then can we determine whether the violative nature of the officials' particular conduct is clearly established." *Clark v. Coupe*, 55 F.4th 167, 181 (3d Cir. 2022) (cleaned up).

5

The courts have not identified a clearly established right as it relates to strip searches of prisoners for contraband such that it would have been clear to any of the Defendants that their conduct was unlawful.  Far from it.

The Supreme Court has noted that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546. (1979).  Furthermore,

> correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials.  This Court has repeated the admonition that, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters.

*Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328 (2012) (cleaned up).  This is because "[s]omething as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves." *Id.* at 333.

To raise a Fourth Amendment claim based on a strip search, the prisoner must allege that the strip search was unreasonable.  *See Payton v. Vaughn*, 798 F. Supp. 258, 261-62 (E.D. Pa. 1992); *see also Marrow v. Pennsylvania*, 2018 WL 4963982, at *4 (M.D. Pa. Oct. 2018).  As noted, while a strip search may constitute a "significant intrusion on an individual's privacy," *United States v. Whitted*, 541 F.3d 480, 486 (3d Cir. 2008), in the prison setting, where security and the prevention of the introduction of contraband and weapons into the facility is at stake, reasonable strip searches do not

violate the Fourth Amendment. *See Florence v. Board of Chosen Freeholders*, 621 F.3d 296, 309-11 (3d Cir. 2010).

For example, the Third Circuit has held that prison officials may conduct visual body cavity searches whenever an inmate enters and exits his cell in the segregated housing unit, if performed in a reasonable manner. *Millhouse v. Arbasak*, 373 F. App'x 135, 137 (3d Cir. 2010). This Court has held that thrice daily strip searches of inmates in isolation did not violate the Eighth Amendment. *See Price v. Pierce*, 2019 WL 156932, at *5 (D. Del. Jan. 9, 2019).[5]

With regard to Defendants Brady and McCormick, the DDOC policy at issue required that "[a]ll offenders are subject to strip search" when "[b]eing placed in disciplinary detention." (D.I. 55-2 at 3). This policy could well be read to require the second strip search, because that was the point in time when Plaintiff was actually being placed into disciplinary detention, despite Brady having conducted a strip search in the receiving room prior to the walk to isolation. Construing the policy in the light most favorable to Plaintiff, however, the second strip search was not required by the policy. Regardless, the second strip search, even if not required by the policy, did not violate a right so clearly established that a reasonable correctional officer would have known that the search was unlawful, given the extensive deference afforded to prison officials to search for contraband. *See Florence*, 566 U.S. at 328, 333. Accordingly, Defendants Brady and McCormick are entitled to qualified immunity as the Fourth Amendment claim against them.

---

[5] The plaintiff in *Price* did not bring the strip search claim under the Fourth Amendment. *See Price*, 2019 WL 156932, at *1 n.5

Similarly, Defendants Dotson and May are entitled to qualified immunity as to the Fourth Amendment claim against them for setting the policy requiring daily strip searches of prisoners in isolation (which, based on Plaintiff's allegations appears to have been a significant reduction to the number of daily strip searches required by the prior policy for prisoners in isolation).[6]

## IV.   CONCLUSION

For the above reasons, the Court will grant Defendants' motion for summary judgment.

An appropriate Order will be entered.

---

[6] It is unclear precisely what point Plaintiff was trying to make in invoking the comment of the correctional officer at his meeting with Lt. Spencer that the policy had changed from one strip search per shift to one strip search per day.  Given that shifts are presumably shorter than a day, the policy change appears to have resulted in less strip searches per day of inmates in isolation.  Indeed, in *Price*, a 2019 case involving strip searches of inmates in isolation at JTVCC, this Court noted:

> The Warden during the relevant time-frame states that when he assumed the warden's position, a standard operating procedure was in place that required cell searches to be conducted of inmates in isolation during each shift and, with cell searches, it was expected that staff would also conduct a strip search. There were three shifts per day while Plaintiff was housed in isolation.

2019 WL 156932, at *2 (cleaned up).  This implies that the change to once daily strip searches constituted a two-thirds reduction in daily strip searches.